# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Cathy L. Waldor |
| | : | |
| v. | : | |
| | : | |
| NING GUO, a/k/a "Danny," a/k/a "Peter," a/k/a | : | Crim. No. 12-7060 |
| "The Beijing Kid," | : | |
| GUO HUA ZHANG, a/k/a "Leo," a/k/a "Alex," | : | |
| WAN PING REN, a/k/a "Helen," | : | **CRIMINAL COMPLAINT** |
| YI JIAN CHEN, a/k/a "Kenny," | : | |
| JIAN ZHI MO, a/k/a "Jimmy," | : | |
| YUAN FENG LAI, a/k/a "Leo," | : | |
| YUAN BO LAI, a/k/a "Paul," | : | |
| KONG BIAO WANG, a/k/a "Karl Wang," | : | |
| HUI HUANG, a/k/a "Rick Wang," | : | |
| MING ZHENG, a/k/a "Uncle Mi," | : | |
| GOU QIANG ZHAO, and | : | |
| BASSIROU ISSOUFOU, a/k/a "Butch" | : | |

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.  From at least as early as in or about August 2008 to in or about February 2012, in Essex and Union Counties, in the District of New Jersey and elsewhere, the defendants listed on Attachment A, did:

SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

SEE ATTACHMENT B

continued on the attached page and made a part hereof.

Ronald Pascale, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

March 1, 2012, at Newark, New Jersey

HONORABLE CATHY W. WALDOR
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

ATTACHMENT A

**<u>Count 1 – Conspiracy to Traffic in Counterfeit Goods</u>**

From at least as early as in or about August 2008 to in or about February 2012, in Essex and Union Counties, in the District of New Jersey, and elsewhere, defendants

NING GUO, a/k/a "Danny," a/k/a "Peter," a/k/a "The Beijing Kid,"
GUANG YANG LI, a/k/a "Andy,"
GUO HUA ZHANG, a/k/a "Leo," a/k/a "Alex,"
WAN PING REN, a/k/a "Helen,"
YI JIAN CHEN, a/k/a "Kenny,"
JIAN ZHI MO, a/k/a "Jimmy,"
YUAN FENG LAI, a/k/a "Leo,"
YUAN BO LAI, a/k/a "Paul,"
KONG BIAO WANG, a/k/a "Karl Wang,"
HUI HUANG, a/k/a "Rick Wang," and
BASSIROU ISSOUFOU, a/k/a "Butch"

did knowingly and intentionally conspire and agree with each other and with others to traffic and attempt to traffic in goods and services and knowingly used counterfeit marks on and in connection with such goods and services, and intentionally trafficked and attempted to traffic in labels, patches, stickers, wrappers, badges, emblems, medallions, charms, boxes, containers, cans, cases, hangtags, documentation, and packaging of any type and nature, knowing that counterfeit marks had been applied thereto, the use of which was likely to cause confusion, to cause mistake, and to deceive.

In violation of Title 18, United States Code, Section 2320 and Section 2.

## Counts 2 through 6 – Trafficking in Counterfeit Goods

On or about the dates set forth below, in Essex and Union Counties, in the District of New Jersey, and elsewhere, defendants

NING GUO, a/k/a "Danny," a/k/a "Peter," a/k/a "The Beijing Kid,"
GUO HUA ZHANG, a/k/a "Leo," a/k/a "Alex,"
WAN PING REN, a/k/a "Helen,"
YI JIAN CHEN, a/k/a "Kenny,"
JIAN ZHI MO, a/k/a "Jimmy,"
YUAN FENG LAI, a/k/a "Leo," and
YUAN BO LAI, a/k/a "Paul"

did knowingly and intentionally traffic and attempt to traffic in goods and services and knowingly used counterfeit marks on and in connection with such goods or services, and intentionally trafficked and attempted to traffic in labels, patches, stickers, wrappers, badges, emblems, medallions, charms, boxes, containers, cans, cases, hangtags, documentation, and packaging of any type and nature, knowing that counterfeit marks had been applied thereto, the use of which was likely to cause confusion, to cause mistake, and to deceive, as specified in the following chart:

| Count | Defendant(s) | Approximate Date | Description |
|-------|--------------|------------------|-------------|
| 2 | ZHANG and REN | June 2010 | Nike Sneakers |
| 3 | CHEN and GUO | August 2010 | Nike Sneakers |
| 4 | GUO and MO | June 2011 | Nike Sneakers |
| 5 | FENG LAI, MO, and GUO | September 2011 | UGG Footwear |
| 6 | FENG LAI, BO LAI, MO, and GUO | December 2011 | UGG Footwear |

In violation of Title 18, United States Code, Section 2320 and Section 2.

## Count 7

From at least as early as in or around September 2010 to in or about February 2012, in Essex and Union Counties, in the District of New Jersey, and elsewhere, defendants

NING GUO, a/k/a "Danny," a/k/a "Peter," a/k/a "The Beijing Kid,"
JIAN ZHI MO, a/k/a "Jimmy,"
YUAN FENG LAI, a/k/a "Leo,"
MING ZHENG, a/k/a "Uncle Mi," and
GOU QIANG ZHAO

did knowingly and willfully conspire and agree with each other and with others to conduct financial transactions which they believed involved the proceeds of a specified unlawful activity, namely narcotics trafficking and gambling, among others, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of property that was the proceeds of specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i).

In violation of Title 18, United States Code, Section 1956(h).

**ATTACHMENT B**

I, Ronald Pascale, have been a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately eight years, and I have been personally involved in the investigation of this matter. The information contained in this Complaint is based on my personal knowledge and on information obtained from other sources, including: a) statements made or reported by various witnesses with knowledge of relevant facts; b) my review of publicly available information relating to the defendants; and c) my review of business records, bank records and other documents and evidence obtained through Court orders, subpoenas and other sources. Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include every fact that I have learned during the course of the investigation. Where the content of documents and the actions, statements, and conversations of individuals are recounted herein, they are recounted in substance and in part, and the content of statements and meetings are based on partial, non-verbatim summaries of the conversations based on descriptions of the conversations prepared by monitors.

**BACKGROUND**

1.  Beginning in or around August 2008 and continuing through in or around February 2012, the defendants ran an international counterfeit goods smuggling and distribution conspiracy. Through the conspiracy, the defendants imported more than 35 containers accounting for more than 100 tons of counterfeit goods with a retail value of in excess of $25 million. The counterfeit goods included counterfeit Nike sneakers and UGG boots; Burberry, Louis Vuitton, Coach, and Gucci handbags; and cigarettes, among other items. To effectuate the importation, the defendants paid more than $900,000 to undercover law enforcement agents posing as individuals who owned a shipping company with "connections" at Port Newark-Elizabeth Marine Terminal (the "Port"). Certain defendants also engaged in a money laundering conspiracy.

2.  At all times relevant to this Complaint:

    a.  The Port was operated by the Port Authority of New York and New Jersey. It was the largest container port in the eastern United States. The Port handled more than 3,700 vessels and more than 2.5 million containers annually, with a total value of more than $100 billion in goods passing through the Port per year.

    b.  Nearly all international trade, including the shipment of goods from China to the United States, involved what was known as intermodal freight transportation. This process allowed freight to be transported using several different "modes" of transport – such as truck, rail, and ship – without the cargo being repeatedly loaded and unloaded from its container.

    c.  The standard units of intermodal freight transportation were corrugated steel containers, also known as "boxes."

d.   Over 90 percent of all international non-bulk cargo moved by containers stacked on transport ships. Of these, more than one quarter originated in China.

e.   Each container of goods imported into the United States through the Port was accompanied by, and tracked using, several kinds of documents (collectively, the "Customs Paperwork"). The Customs Paperwork included "Bills of Lading," which declared a container's contents and provided the terms of the contract between the shipper and the transportation company hired by the shipper to send a container to its destination.

f.   Each container of goods imported into the United States through the Port had to undergo entry procedures administered by United States Customs and Border Protection ("CBP"), the United States government agency responsible for inspecting imported goods. CBP's procedures were designed to ensure that proper duties were paid and that imported goods did not pose hazards to American consumers. As part of CBP's procedures, containers could be placed on "hold." A container on hold was not allowed to leave the Port until the authorities conducted a further examination of the container's contents.

## SUMMARY OF THE INVESTIGATION

3.   The investigation has uncovered a large-scale conspiracy that has imported massive quantities of counterfeit goods from China into the United States. In broad terms:

a.   The defendants and others (collectively, the "Co-Conspirators") imported over 35 containers of counterfeit goods – primarily cigarettes, handbags, and sneakers – into the United States in furtherance of the conspiracy. These goods, if legitimate, would have had a retail value of more than approximately $47 million.

i.   Attached as Exhibits 1, 2, 3, 4, and 5 are photographs of the contents of certain containers of counterfeit goods imported by the Co-Conspirators as part of the scheme.

b.   The Co-Conspirators sought out assistance to import counterfeit goods into the United States, and used a certain corporation to import the goods through the Port. In fact, however, this corporation was a "front company" set up by law enforcement to act as an importer.

c.   The Co-Conspirators imported the counterfeit goods using fraudulent Customs Paperwork, which, among other things, falsely declared the goods within the containers.

d.   Certain Co-Conspirators controlled the importation of the counterfeit goods into the United States. Others managed the distribution of counterfeit goods once those

2

goods arrived in the United States. Yet other Co-Conspirators paid individuals whom, they believed, controlled an importation company with "connections" at the Port. In fact, these individuals were undercover law enforcement agents.[1]

e.   Some Co-Conspirators acted as wholesalers for the counterfeit goods, supplying the retailers who sold counterfeit goods to the ultimate customers in the United States.

f.   A number of Co-Conspirators also engaged in a money laundering conspiracy to disguise and conceal the source of what they believed to be the profits of certain unlawful activity, moving this money through banks in the United States, China, and elsewhere, to disguise the sources of the laundered funds.

4.   Law enforcement introduced several undercover Special Agents (collectively, the "UCs") to the Co-Conspirators. UCs purported to have unspecified connections at the Port, which allowed UCs to obtain containers that were on hold, release the containers from their holds, and pass them through to the Co-Conspirators. The Co-Conspirators paid UCs over $900,000 for these "services."

5.   UCs recorded dozens of phone calls and in-person meetings with various Co-Conspirators. Moreover, the investigation utilized several Court-authorized wiretaps of telephone and electronic communications. Some of the information from these recordings, as well as the results of surveillance, telephone call analysis, subpoena returns, and other investigative techniques, are detailed below.

## THE INVESTIGATION BEGINS

6.   In or around August 2008, a confidential source ("CS"), who had been used in prior investigations and had been proven reliable and credible, informed the FBI that a certain individual based in Hong Kong ("CC-1") was looking for assistance in importing several containers of counterfeit cigarettes and clearing those containers through Customs.

7.   Working with law enforcement, CS provided CC-1 with the contact information for an individual who could clear counterfeit goods through customs and have the goods removed from ports on both the east and west coasts of the United States. This individual was a UC, with whom CC-1 then interacted.

---

[1] Each of the containers traveled in interstate or foreign commerce, since each of the containers originated in China. In addition, many of the containers stopped initially at another United States port, including Savannah, Georgia and Norfolk, Virginia. Finally, after the containers arrived at the Port, and traveled to warehouses, Co-Conspirators and others brought the goods from many of the containers to locations in New York as well as New Jersey.

## THE INDIVIDUAL DEFENDANTS

### Guo Hua Zhang, a/k/a "Leo," a/k/a "Alex" ("Zhang") and Wan Ping Ren, a/k/a "Helen" ("Ren")

8.    In or around May 2010, CC-1 provided the UCs with a bill of lading for another container of counterfeit goods: this time, a container filled with counterfeit Nike sneakers, which arrived in the United States in or around June 2010 (the "June 2010 Counterfeit Sneakers Container"). The bill of lading declared, falsely, that the container held patio furniture. CC-1 then called a UC and gave the UC the phone number for the buyers of the June 2010 Counterfeit Sneakers Container.

9.    The UC subsequently contacted the buyers, who turned out to be defendant Wan Ping Ren, a/k/a "Helen," ("Ren") and defendant Guo Hua Zhang, a/k/a "Leo," a/k/a "Alex" ("Zhang"). The investigation has revealed that Ren and Zhang were major wholesalers of counterfeit goods.[2]

10.   On or about June 10, 2010, UCs conducted a recorded meeting with Ren and Zhang in or around Linden, New Jersey. Ren and Zhang both discussed the logistics of transporting, importing and distributing counterfeit goods, and described the scope of their operations and the resources they had available, including warehouses and multiple trucks. Ren provided the UCs with a package containing approximately $32,000 as payment for the UCs'

_____

[2] The investigation has also revealed that Ren and Zhang also purchased and distributed large quantities of counterfeit goods from the leaders of the counterfeit goods conspiracy charged in United States v. Siu et al., Mag. No. 12-7061 (CLW). During the course of the investigation into Siu, other law enforcement agents also interacted with Ren and Zhang. In or around August 2010, Zhang was first identified as a co-conspirator in the Jiang smuggling scheme. Law enforcement officers then obtained a search warrant for numerous storage units connected to Zhang. Upon execution of this warrant, law enforcement officers found large quantities of counterfeit goods, including approximately 29,000 pairs of counterfeit Nike brand footwear; approximately 1,100 pairs of counterfeit Gucci brand footwear; approximately 2,750 sets of Ed Hardy brand clothing; approximately 480 sets of Juicy Couture brand clothing; and various other counterfeit goods. During the course of the search warrant's execution, law enforcement officers encountered Zhang. He admitted to ownership of the goods inside the storage units, and admitted that he knew they were counterfeit. Zhang was not arrested at the scene because law enforcement officers determined that Zhang's arrest would have been detrimental to the investigation as a whole, as Federal agents arresting an individual for the quantity of counterfeit goods involved would likely have raised suspicion of other co-conspirators.

Zhang also interacted numerous times with an undercover law enforcement officer from the Jiang investigation (the "ICE UC"). For example, Zhang had stated to the ICE UC that he "wanted to do a container and make some money." The ICE UC provided counterfeit goods to Zhang and Ren on several occasions, spoke with Zhang on recorded calls numerous times, and received money from Zhang and others in exchange for counterfeit goods.

"services" in clearing the June 2010 Counterfeit Sneakers Container through Customs, for which CC-1 had provided the bill of lading.

11. The UCs conducted other recorded meetings with Ren and Zhang, during which Ren and Zhang discussed the nature and circumstances of the counterfeit goods business. For example, during a recorded meeting on or about June 6, 2011, Zhang described how he would pick up counterfeit merchandise and, before delivering it to his customer, would drive it to another location until he thought it was "safe" to deliver the counterfeit goods to his customers. At another recorded meeting, on or about July 21, 2011, Zhang stated, in sum and substance, that he knew all of the goods he moved and stored were counterfeit, that he had been in the counterfeit goods business for approximately 20 years, and that counterfeit goods comprised different quality grades, which commanded different prices in the marketplace.

**Yi Jian Chen, a/k/a "Kenny" ("Chen")**

12. In or around August 2010, CC-1 again contacted the UCs regarding a container of counterfeit goods that CC-1 wished to import: this time, a container of counterfeit sneakers. CC-1 then provided fraudulent Customs Paperwork to the UCs and set up the delivery of a container of counterfeit goods to one of his customers. This time, the buyer turned out to be defendant Yi Jian Chen, a/k/a "Kenny" ("Chen").

13. The transaction followed a similar pattern as with Defendants Ren and Zhang. CC-1 provided the UCs with Chen's contact information. The UCs thereafter engaged in multiple recorded meetings with Chen. At one of these meetings, on or around August 31, 2010, Chen and defendant Ning Guo, a/k/a "Danny," a/k/a "Peter," a/k/a "The Beijing Kid" ("Guo") met with certain UCs in or around Linden, New Jersey. Guo provided, on behalf of Chen, approximately $32,000 to ensure the counterfeit goods would be released from the Port and delivered to a warehouse controlled by Co-Conspirators.

14. During a subsequent recorded meeting with certain UCs in or around July 2011, Chen requested the UCs' assistance in obtaining shipments of counterfeit shoes, clothing, and cigarettes. Chen stated that counterfeit cigarettes were the best counterfeit product to sell, because they commanded higher profits, but that recently it had become difficult to smuggle counterfeit cigarettes into the United States. Chen also stated that he would be interested in smuggling quantities of methamphetamine, or "ice," into the United States in containers of counterfeit goods. Chen stated that he could travel to China to obtain the methamphetamine.

15. Finally, as detailed below, in or around November 2011, Chen introduced the UCs to Defendants Kong Biao Wang, a/k/a "Karl Wang," and Hui Huang, a/k/a "Rick Wang."

**Ning Guo, a/k/a "Danny," a/k/a "Peter," a/k/a "The Beijing Kid" ("Guo")**

16.     In or around May 2010, CC-1 directed a 40-foot container filled with counterfeit cigarettes to the United States (the "40 Foot Cigarette Container"), which was destined for a particular buyer. This buyer, however, backed out of the transaction. CC-1 told a UC that the UC should maintain the 40 Foot Cigarette Container, and that CC-1 would try to find another buyer. Also in or around May 2010, CC-1 told the UCs he had a new potential buyer for the 40 Foot Cigarette Container, and provided the UCs with this potential buyer's phone number. This new potential buyer was defendant Ning Guo, a/k/a "Danny," a/k/a "Peter," a/k/a "The Beijing Kid" ("Guo").

17.     During the course of the investigation, Guo was recorded hundreds of times discussing the conspiracy over different telephone facilities, including recordings made consensually by the UCs and calls intercepted pursuant to Court-authorized wire interceptions. Guo also engaged in numerous recorded meetings with the UCs.

        A.     Counterfeit Goods

18.     The UCs first met with Guo in or around May 2010. During a recorded meeting with UCs on or about May 11, 2010, Guo stated, among other things, that Guo was involved in the transportation and storage of counterfeit merchandise in the New Jersey/New York area. Guo claimed to own and operate four warehouses where he stored counterfeit merchandise for his customers. Indeed, Guo claimed he was responsible for moving most of the counterfeit goods in the New Jersey/New York area. Guo described his business model as follows: when his clients ordered counterfeit goods from China they usually had no way of storing the goods or delivering the goods to retail locations. Guo stated that he provided this service. Guo then stated that he would be interested in communicating further with the UCs regarding the importation of counterfeit goods, and provided the UCs with Guo's phone number and e-mail address.

19.     On or about June 14, 2010, during a recorded meeting, Guo told certain UCs that he had two containers of counterfeit goods ready to be shipped from China to the United States, and that he would like the UCs to clear these counterfeit goods through Customs. The UCs informed Guo that the price for moving these containers into the United States would be approximately $30,000 per container.

20.     Guo stated that he had multiple containers of counterfeit goods that had already been shipped from China, but that had been seized by Customs, and asked whether the UCs could assist in retrieving those containers.

21.     In or about June 2010, Guo began importing containers of counterfeit goods through the UCs. As just one example, on or about June 24, 2010, Guo sent an e-mail to a UC which read, in pertinent part, "Hi [UC] I need you company info and tax number, by the way i give you two container #tclu5227700 and #cbhu8180934 this two container already in port

6

nework. see something you can do, if you can i haver more like this. Danny"[3]  The container numbers referenced by Guo in this e-mail were containers that had been put on hold by Customs.

22.   These containers were inspected by law enforcement, and determined to contain counterfeit goods.  One of these containers was delivered to Guo on or about August 31, 2010, and the UCs received approximately $50,000 in payment for these goods on or about August 31, 2010.

23.   Guo also frequently utilized fraudulent Customs Paperwork in furtherance of the counterfeit goods scheme.  As just one example, on or about September 2, 2010, Guo sent an e-mail to a UC.  The e-mail read, in pertinent part: "This is tow boxes ISF.  Danny."  Attached to the e-mail were "ISF" forms – a type of Customs Paperwork – for two containers of counterfeit goods.  These forms contained false and fraudulent information.

24.   In total, during the course of the investigation, Guo imported approximately 31 containers of counterfeit goods though the UCs, and provided the UCs with over approximately $800,000 for their "services."

### B.   Money Laundering

25.   Beginning in or around September 2010, Guo also engaged in an international money laundering scheme with Defendants Ming Zheng, a/k/a "Uncle Mi," Jian Zhi Mo, a/k/a "Jimmy," Yuan Feng Lai, a/k/a "Leo," and others.

26.   Guo described the money laundering scheme during recorded conversations with UCs.  Guo stated that for every $50,000 in cash the UCs provided, Guo and others would return approximately $42,500 – via wire transfers from banks in China – into a bank account set up by the UCs.

27.   Guo provided a step-by-step breakdown of the scheme: when he received money from the UCs to be laundered, he would then contact an individual physically located in the United States.  (The investigation subsequently revealed this person to be Defendant Ming Zheng.)  Guo stated that this individual would then contact a Chinese-based co-conspirator, and transfer the money to locations in China.  Then, the money (less the laundering fee) would be transferred from in or around Fujian, China to a bank in or around Guangzho, China where it would be subsequently withdrawn and physically transported via courier to a bank in Hong Kong.  The final transfer would be from the bank in Hong Kong to the UCs' bank account.  Guo stated that his contacts in China did not care what the origin of the money was – be it drugs, gambling, official corruption, or other specified unlawful activities.

---

[3] All spelling and punctuation is as per the original.

28.    The UCs began providing money to be laundered directly to Guo, and conducted three such transactions with Guo in or around November and December 2010.

29.    For example, on or about December 21, 2010, during a recorded meeting, UCs provided Guo with approximately $50,000 to launder.

30.    Soon afterwards on the same day, Guo called Ming Zheng. During a conversation intercepted pursuant to a Court-authorized wiretap, Guo asked, "Where are you?" Ming Zheng replied, "I'm in Chinatown." Guo stated, "I have five for you. You're at the old location?" Ming Zheng replied, "At the company. What time you arrive?" Guo replied, "I'll drive over now."

31.    On or about December 29, 2010, just as Guo had described the scheme, Guo caused approximately $42,500 to be wired from China into a bank account controlled by the UCs.

32.    Guo traveled to China in early 2011, and was unable to return to the United States due to a visa issue. Thereafter, the UCs began providing the cash to be laundered to Mo, Yuan Feng Lai, and others after setting up the transactions with Guo through telephonic and electronic communications.

33.    In total, the Co-Conspirators laundered approximately $705,000 in approximately 15 different transactions during the investigation. Guo was involved in approximately 12 of these transactions, totaling approximately $630,000. For each of these approximately 12 transactions, the UCs interacted with Guo either in person or through recorded telephonic or electronic communications.

### Jian Zhi Mo, a/k/a "Jimmy" ("Mo")

34.    In or around October 2010, Guo met with a UC to discuss the importation of counterfeit goods. Guo handed the UC an envelope that contained various Customs Paperwork for containers of counterfeit goods. Written on the envelope was defendant Mo's name and address. When the UC asked who Mo was, Guo replied that Mo was Guo's employee, and had been with Guo for approximately 10 years.

35.    Beginning in or around March 2011, UCs began interacting directly with Mo in furtherance of the counterfeit goods and money laundering schemes. Before Guo left the United States in or around February 2011, he arranged a meeting between Guo, Mo, and certain UCs, because, Guo stated, Mo was to assume Guo's business responsibilities while Guo was in China. During the meeting, the parties discussed the delivery of containers of counterfeit goods and the laundering of money, and it was agreed that Mo would coordinate these activities, with continued input by Guo via telephonic and electronic communications.

### A.   Counterfeit Goods

36.   Thereafter, on various occasions, Mo met with various UCs to provide false and fraudulent Customs Paperwork to the UCs relating to shipments of counterfeit goods. As just one example, on or about June 24, 2011, Mo provided false and fraudulent Customs Paperwork to UCs for three containers of counterfeit goods. The bills of lading stated, falsely, that the containers were comprised of "Soap dish, plastic airsofa, fridge magnets." In fact, however, these containers were filled with counterfeit footwear.

37.   Mo also received counterfeit goods from UCs, and transported counterfeit goods to locations controlled by the Co-Conspirators. For example, on or about September 8, 2011, Mo, along with defendant Yuan Feng Lai, a/k/a "Leo," and others met with UCs at a warehouse. Feng Lai provided UCs with a bag containing approximately $25,000 as payment for the clearance of a container of counterfeit goods. The Co-Conspirators then loaded trucks with counterfeit goods, and departed.

38.   During the course of the investigation Mo paid UCs hundreds of thousands of dollars as the UCs' "fees" for clearing the containers of counterfeit goods through Customs, in furtherance of the counterfeit goods scheme.

39.   As just one example, on or about August 2, 2011, Mo met with a UC in or around Linden, New Jersey. Mo provided the UC with a bag containing cash. The UC asked whether the bag contained "75." Mo acknowledged that the bag contained approximately $75,000, the amount the Co-Conspirators owed the UCs for passing certain counterfeit goods through the Port.

### B.   Money Laundering

40.   Mo was also instrumental in the money laundering offenses. After defendant Guo left the United States in or about February 2011, Mo took the money to be laundered from the UCs and provided it to Defendant Ming Zheng and others.

41.   Thus, on numerous occasions, after the UCs contacted Guo to initiate money laundering transactions, Guo instructed the UCs to meet Mo at a pre-arranged time and location – usually in the Chinatown section of New York, New York. On each occasion, the UCs provided Mo with cash to be laundered. Surveillance established that, on each occasion, Mo then handed the UCs' cash to Ming Zheng. Several days after each such transaction, the UCs received deposits of money – minus the Co-Conspirators' money laundering fees – into the UCs' bank account.

42.   As just one example, on or about May 26, 2011, a UC engaged in a recorded meeting with Mo in or around the Chinatown section of Manhattan. The UC handed Mo a box containing approximately $75,000 to be laundered. Mo then asked the UC if the box contained "75." The UC replied in the affirmative.

9

**Yuan Feng Lai, a/k/a "Leo" ("Feng Lai")**

43.   On or about October 4, 2010, during a recorded meeting, Defendant Guo advised a UC that a new Co-Conspirator would be serving the role previously served by Defendant Zhang. Specifically, Guo stated that this new co-conspirator, Defendant Yuan Feng Lai, a/k/a "Leo" ("Feng Lai"), was trustworthy, and had worked with Guo for a long time. Guo stated that Feng Lai would be supervising operations at one of the warehouses to which counterfeit goods were delivered. Accordingly, Feng Lai would be receiving shipments of counterfeit goods that had been passed through the Port, paying the UCs, and coordinating the delivery of the counterfeit goods to customers. As described below, Feng Lai engaged in all of these activities.

     A.    Counterfeit Goods

44.   The UCs engaged in numerous recorded meetings with Feng Lai. For example, on or about September 27, 2011, UCs met with Feng Lai, Mo, and others at a warehouse in or around Clifton, New Jersey. During a recorded conversation, Feng Lai provided a UC with a box and an envelope. Feng Lai stated, in sum and substance, that the box contained "25,000," and the envelope contained paperwork relating to "another container." The box contained approximately $25,000 as payment to UCs for the delivery of a container of counterfeit goods, and that the envelope contained false and fraudulent Customs Paperwork for another container of counterfeit goods. Feng Lai, Mo, and others then loaded trucks with counterfeit footwear. Feng Lai placed additional counterfeit goods into a Lexus automobile registered in his name, and departed.

45.   Similarly, on or about October 13, 2011, UCs met with Feng Lai and Mo. Feng Lai handed UCs a bag containing approximately $49,000, as well as an envelope containing Customs Paperwork for containers of counterfeit goods. Mo, Feng Lai, and Conspirator Yuan Bo Lai, a/k/a "Paul," then loaded numerous boxes of counterfeit goods into trucks and departed.

     B.    Money Laundering

46.   Feng Lai also played a role in the money laundering scheme, by accepting money for UCs which he then passed on to Ming Zheng and others.

47.   For example, on or about September 20, 2011, after communications with Guo and others to set up a meeting to provide money to be laundered, a UC met with Feng Lai and others in or around the Chinatown section of New York, New York. During a recorded meeting, the UC provided Feng Lai with a package containing approximately $50,000 and told Feng Lai, in sum and substance, that the package contained approximately $50,000. Shortly thereafter, Feng Lai was then observed by law enforcement officers meeting with Ming Zheng, and Ming Zheng was then seen carrying a package identical to the one provided to Feng Lai by the UC.

48.    In addition, at the October 13, 2011 meeting, discussed above, Feng Lai handed the UCs an envelope containing documents relating to previous money laundering transactions between the Co-Conspirators and the UCs.

**Yuan Bo Lai, a/k/a "Paul" ("Bo Lai")**

49.    Yuan Bo Lai, a/k/a "Paul" ("Bo Lai") was involved in receiving and transporting counterfeit goods. Bo Lai also paid the UCs tens of thousands of dollars as the UCs' "fees" for clearing the containers of counterfeit goods through Customs, in furtherance of the counterfeit goods scheme. Bo Lai often worked with Defendant Feng Lai and Defendant Mo.

50.    For example, as noted above, on or about October 13, 2011, Bo Lai worked with Mo and Feng Lai to load numerous boxes of counterfeit goods into trucks, and took them to a warehouse controlled by the Co-Conspirators.

51.    As another example, on or about December 2, 2011, UCs arranged with Feng Lai to receive payment from the Co-Conspirators for clearing counterfeit goods through Customs. Later that day, Bo Lai arrived at a pre-determined location in or around Linden, New Jersey. Bo Lai handed a UC approximately $40,000 in cash, and departed.

**Kong Biao Wang, a/k/a "Karl Wang" ("Biao Wang") and**
**Hui Huang, a/k/a "Rick Wang" ("Hui Huang")**

52.    In or around November 2011, Defendant Kenny Chen spoke with a UC and provided the UC with the phone numbers for two other importers of counterfeit goods. Chen stated those importers needed the UC's "assistance" in clearing counterfeit goods from the Port. These two importers turned out to be Defendants Kong Biao Wang, a/k/a "Karl Wang" ("Biao Wang") and Hui Huang, a/k/a "Rick Wang" ("Hui Huang").

53.    On or about December 14, 2011, certain UCs met with Biao Wang and Hui Huang in or around Linden, New Jersey. Biao Wang and Hui Huang indicated that they had two containers which they wanted removed from the Port. The UCs told Biao Wang and Hui Huang that the UCs would require approximately $50,000 per container to remove the goods from the Port, and stated that the UCs would need the bills of lading for the goods.[4] The parties exchanged e-mail addresses so that Biao Wang and Hui Huang could transmit the bills of lading.

54.    On or about December 14, 2011, the UCs received e-mails from Biao Wang and Hui Huang, attaching Customs Paperwork for the two containers to which Biao Wang and Hui Huang had referred. The Customs Paperwork included false and fraudulent information. For example, a bill of lading for one container asserted that one container included "plastic

---

[4] The price was later lowered to approximately $40,000 per container.

photo frame[s]." A packing list claimed that the other container included "square picket open top" fencing. In fact, the two containers were filled with counterfeit Nike sneakers and labels for counterfeit UGG brand footwear.

55. On or about February 6, 2012, certain UCs met again with Defendants Biao Wang and Hui Huang. The UCs discussed the timing and delivery of the containers of counterfeit goods. Biao Wang advised that he and Hui Huang would not be able to pay the entire $80,000 to the UCs at once, and so asked to pay $40,000 upon receipt of one container of counterfeit goods, and the other $40,000 upon receipt of the second container.

56. On or about February 27, 2012, certain UCs delivered a container of counterfeit goods to Biao Wang and Hui Huang, and received approximately $40,000 from these Defendants in exchange for the counterfeit goods.

**Ming Zheng, a/k/a "Uncle Mi" ("Ming Zheng")**

57. As noted above, the UCs began laundering money with the Co-Conspirators by providing money directly to Defendant Guo. After Guo left the United States in or around February 2011, the UCs began providing money to Defendants Mo and Feng Lai. In both cases, however, Guo and Mo each then provided the money to be laundered to Defendant Ming Zheng, a/k/a "Uncle Mi" ("Ming Zheng").

58. Ming Zheng was therefore instrumental in each of the money laundering transactions – he received the cash from other Co-Conspirators, and then caused it to be transferred overseas in furtherance of the laundering process.

59. Beginning in or around May 2011, law enforcement authorities obtained Court orders to intercept wire and electronic communications over telephone facilities controlled by Ming Zheng. These interceptions provided further evidence of Ming Zheng's role in the money laundering scheme.

60. For example, on or about July 5, 2011, Mo called Ming Zheng. During an intercepted communication, Mo stated, "Hello? I am going to send something over to you." Ming Zheng replied, "Downstairs." Mo replied, "East Broadway. Same place." Ming Zheng then asked, "How long?" Mo replied, "Soon."

61. Shortly thereafter, the UCs met with Mo in or around the Chinatown section of New York, New York and provided Mo with a package containing approximately $60,000 in cash to launder.

62. A few minutes later, Mo called Ming Zheng again, and stated, "I am coming soon. I will be there in two or three minutes." Mi replied, "Okay." Law enforcement officers then surveilled Mo meet Ming Zheng on or around East Broadway, and hand Ming Zheng a package identical to the one that the UCs had given to Mo just minutes earlier.

12

63. Still later on or about July 5, 2011, Ming Zheng received a text message from Guo, which read, "Do you receive it?" Ming Zheng replied, stating, "Got it." Guo then texted, "Which day is the departure date?" (Guo is asking when the money will be sent to China to begin the process of being laundered.) Ming Zheng replied, "Tomorrow." Guo wrote back, "That's good."

64. Ming Zheng then had intercepted communications with another Co-Conspirator ("CC-2") regarding sending this money to China to be laundered.

65. Surveillance then confirmed that Ming Zheng left his apartment with a bag and then walked to Essex Street (just a couple of blocks from his home) and handed the bag to an individual believed to be CC-2.

66. Later in the investigation, the UCs began meeting with Ming Zheng directly, in furtherance of the money laundering scheme, and Mo was present at certain of these meetings. For example, on or about August 3, 2011, UCs met in or around the Chinatown section of Manhattan with Mo and Ming Zheng. The UCs provided Ming Zheng with approximately $60,000 to launder. The UCs stated, in sum and substance, that this money – along with the prior money that had been laundered through Guo, Mo, and Ming Zheng, among others – came from gambling, "ice" (i.e., methamphetamine), and "powder" (i.e., heroin and cocaine).

67. During several meetings with Ming Zheng, one UC told Ming Zheng that the UC would like to launder funds separate and apart from the money being laundered for the other UCs. This UC told Ming Zheng that the money was profits from drug sales. Late in the investigation, Ming Zheng engaged in four such transactions, each in the amount of approximately $25,000, for a total of approximately $100,000. For example, on or about November 22, 2011, a UC conducted a recorded meeting with Ming Zheng in or around the Chinatown section of New York, New York. During the meeting, the UC provided Ming Zheng with approximately $25,000 in funds to launder. The UC reiterated that the money was the proceeds of drug sales. The UC then stated that the UC wanted the laundered funds to come in the form of checks written from a business account. On or around November 23, 2011, Ming Zheng provided the UC with a cashier's check in the amount of approximately $22,000 drawn on the account of a corporation controlled Gou Qiang Zhao.

## Gou Qiang Zhao ("Qiang Zhao")

68. Defendant Gou Qiang Zhao ("Qiang Zhao") participated in the money laundering scheme with defendant Ming Zheng and others. Numerous telephone conversations between Qiang Zhao and Ming Zheng were recorded over Court-authorized wiretaps.

69. As discussed above, on or around November 22, 2011, a UC met with Ming Zheng and provided Ming Zheng with approximately $25,000 to launder, pursuant to the scheme set forth above.

13

70. The same day, Ming Zheng called Qiang Zhao and, on a recorded call, asked, "Can you come over . . . no . . . I will go to meet you on the street. . . . How much company check can you issue?" Qiang Zhao replied, "Huh, what do you mean how much I can issue?" Ming Zheng replied, "If they give you money, how much you can issue on a company check?" Qiang Zhao replied, "There should be no limit on a company check right?" Ming Zheng replied, "No limit . . . can you expand the company? If you expand the company, I . . . can give some of mine to you to do." (Ming Zheng is telling Qiang Zhao that he can provide some money to Qiang Zhao to launder if Qiang Zhao agrees to move the money through his companies.) Qiang Zhao replied, "Ok, ok." Later in the conversation, Qiang Zhao asked, "Are you in rush today or what?" Ming Zheng replied, "Yes, in rush, he has to receive this within one or two days."

71. On or about November 23, 2011, surveillance revealed that Ming Zheng met with Qiang Zhao in or around the Chinatown section of New York, New York. Qiang Zhao handed paperwork to Ming Zheng at or around a Chase bank.

72. Shortly thereafter, Ming Zheng provided the UC with checks in the amount of approximately $22,000, drawn on the account of an entity named "New Sight Media, Inc."

73. The investigation has revealed that Qiang Zhao opened and controlled the bank account of "New Sight Media, Inc."

74. On or around December 1, 2011, a UC met with Ming Zheng, and provided Ming Zheng with additional funds to launder. When the UC asked about the background of the owner of "New Sight Media Inc.," Ming Zheng replied that the person was one of Ming Zheng's "brothers." The UC asked to meet this individual, to further discuss using multiple businesses to issue the checks of laundered money. Ming Zheng replied that this could be arranged.

75. On or about December 6, 2011, the UC met with Ming Zheng and Qiang Zhao. During the meeting, the parties discussed having Qiang Zhao open more businesses to launder the UC's money.

**Bassirou Issoufou, a/k/a "Butch" ("Issoufou")**

76. In or around October 2010, Defendant Guo was observed meeting with Defendant Bassirou Issoufou, a/k/a "Butch" ("Issoufou") in or around the Bronx, New York. Law enforcement officers then compared Issoufou's DMV photograph to the individual seen meeting with Guo in or around October 2010, and determined that they were one and the same person.

14

77.   Issoufou was recorded numerous times over Court-authorized wiretaps discussing the counterfeit goods scheme with Guo and others.

78.   For example, on or about December 13, 2010, Guo called Issoufou.  Guo began the call by telling Issoufou that Guo was in Brooklyn.  Issoufou asked Guo how much money Issoufou owed Guo, and Guo replied that Issoufou should pay Guo approximately $15,000.  Issoufou stated that he would pay Guo the next day, and then asked Guo about the availability of UGG brand footwear.

79.   As another example, on or about December 19, 2010, Issoufou called Guo, and asked, "Can you put 5 kinds each or the truck is full?"  (Issoufou is asking whether Guo can load five varieties of counterfeit goods onto a truck for delivery to Issoufou.)  Guo replied, "The truck is full."  Issoufou then stated, "Okay, no problem.  Then I come pick up."  Guo replied, "Yeah, better.  I'll put 7 box UGG, I'm not sure how many black, and how many box white.  You know I filled 50 box, right?  50 box black and white.  Long-top!  Filled up the 50 box long-top.  I'll try to make it 50, but in the end, it all depends on the truck, okay?"

80.   On or about December 20, 2010, Guo called Issoufou, and asked, "Have you got the money?"  Issoufou replied, "I'll give you everything tomorrow."  Guo replied, "You give me 20?  You should give me 25."  (Guo is telling Issoufou that Issoufou should pay Guo $25,000.)  Issoufou replied, "I don't have I am telling you. . . . I will give you tomorrow."

81.   The investigation has further revealed that Issoufou's links to counterfeit goods extended throughout the United States.  In or around September 2011, law enforcement officers executed a search warrant at a store located in or around Decatur, Illinois.  The search uncovered hundreds of items of counterfeit goods, including counterfeit Nike shoes.  Numerous pairs of counterfeit shoes were found within a large cardboard box.  Affixed to the outside of the box was a UPS shipping label, which bore – in the "sender" area – the exact same telephone number, (646) 460-2478, as used by Issoufou when communicating with Guo about counterfeit goods during intercepted communications.  Moreover, the sender's address was identical to the address provided for a bank account associated with Issoufou.

82.   Moreover, the investigation has revealed that Issoufou wrote checks drawn on his bank account to a business controlled by defendant Mo, and also to various storage facilities, which are commonly used by traffickers in counterfeit goods to store their contraband.





GOVERNMENT EXHIBIT 2



GOVERNMENT
EXHIBIT
3



GOVERNMENT
EXHIBIT
4



GOVERNMENT
EXHIBIT
5